IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00248-DDD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     JESUS SANTOS RIVAS-HIDALGO
       Defendant.

---

**DEFENDANT'S MOTION FOR A VARIANT SENTENCE**

---

    JESUS SANTOS RIVAS-HIDALGO, through his counsel Luke W. McConnell of Mulligan Breit McConnell, LLC, pursuant to 18 U.S.C. §3553(a) and the applicable law, respectfully moves this Court for a variant sentence. In support, Mr. Rivas-Hidalgo states as follows:

### I. Introduction

    Jesus Santos Rivas-Hidalgo is a hard-working U.S. citizen with two teenage children, a wife, and a business that provides the sole source of support for himself and his family. Mr. Rivas-Hidalgo was born in El Salvador, but he has lived in the U.S. for over 25 years. It is undisputed that Mr. Rivas-Hidalgo poses no threat to the community and his conduct while on pre-trial release has been exemplary. Furthermore, despite the fact that he procured a new passport by falsely stating his passport had been lost, he applied for the passport in his own name. It is also undisputed that he didn't seek a new passport for a nefarious purpose, and his actions have not affected or victimized

1

another person. To the extent that questions remain about the alleged connection between Mr. Rivas-Hidalgo and someone named "Gilberto Guerra-Mayorga," those issues have been removed from consideration in this case through its resolution and are properly dealt with in another forum. Because the felony conviction in and of itself provides the most meaningful punishment in this case, and is significant, Mr. Rivas-Hidalgo requests that the Court follow the recommendation of probation and sentence him to time-served and one year of supervised release. As explained in more detail below, that sentence would be sufficient, but not greater than necessary, to accomplish the purposes of sentencing. 18 U.S.C. §3553(a).

## II.  The Court's Sentencing Authority

It is well settled that the Court is not bound by the sentencing guidelines—the guidelines are "advisory." *United States v. Booker*, 543 U.S. 220 (2005); *Pepper v. U.S.* 562 U.S. 476 (2011). However, the latitude provided by freedom from the guidelines does not mean the Court is without limitation or guideposts. The Court is obligated to apply the factors laid out in 18 U.S.C. §3553(a), as modified by *Booker*, and a reviewing court will overturn a substantively or procedurally deficient sentence resulting from an abuse of discretion. *See United States v. Hailey*, 529 F.3d 1308, 1311 (10th Cir. 2008). The Court is permitted to accept any relevant information about a defendant's background and must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81 (1996)); 18 U.S.C. §3661; USSG §1B1.4. The goal is for the

Court to utilize its broad discretion pursuant to the §3553(a) factors to fashion a punishment that fits the offender and not the crime. *Id.* at 487-488; 18 U.S.C. §3553.

### III. §3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant.

A. The history and characteristics of the defendant.

Mr. Rivas-Hidalgo is a U.S. Citizen and has been since his naturalization in 2012. To the extent the government continues to have questions about Mr. Rivas-Hidalgo's identity, which seems to be indicated by their comments to the probation office, *see* Doc. 40, ¶¶ 12-16, the appropriate place to assert those concerns is in the immigration courts. Furthermore, in this proceeding, the government has abandoned the charges which relate to concerns over Mr. Rivas-Hidalgo's citizenship and identity, and has further signified this by omitting an "a.k.a." from the case caption and filing an information in Mr. Rivas-Hidalgo's name only. It is also worth noting that when this case began, the government was asserting that the defendant's true name, as captioned above, was actually an a.k.a.

Therefore, the manner in which this case has resolved puts questions about the alleged connection between Mr. Rivas-Hidalgo and a one "Gilberto Guerra-Mayorga" outside the relevance of this proceeding. The sentencing analysis in this case should be conducted from the perspective of an American citizen defendant who falsely stated they lost their passport on a renewal application. Indeed, in the government's sentencing statement, there is no argument that the court should consider more when deciding on the appropriate sentence.

Mr. Rivas-Hidalgo has maintained throughout this case that he is who he says he

3

is, and the proof of this was first presented at his detention hearing when he was still accused of actually being Gilberto Guerra-Mayorga. Mr. Rivas-Hidalgo's identity is fully traceable to his birth and to his family in El Salvador. In contrast, the government has never established that the identity of Gilberto Guerra-Mayorga, born in Guatemala, is even a real person or not. The allegation in this case is not that Mr. Rivas-Hidalgo falsified his name, date of birth, country of origin, or any other similar information on his passport application—in other words, he did not apply for a passport with a fake identity. The personal identifying information on Mr. Rivas-Hidalgo's passport application is the same as that used throughout his naturalization process.

However, even though this court cannot directly revoke Mr. Rivas-Hidalgo's citizenship, the one way in which the court's sentence could impact Mr. Rivas-Hidalgo's citizenship is if the court sentences him to more than 365 days in prison. This length of sentence (which not even the government recommends) could constitute grounds for Mr. Rivas-Hidalgo's removal if there are denaturalization proceedings. Thus, Mr. Rivas-Hidalgo makes the baseline request that any sentence to incarceration, should there be one, be less than one year because otherwise this court could in effect cause Mr. Rivas-Hidalgo's denaturalization—a punishment far too severe for the conduct at issue here.

Mr. Rivas Hidalgo has lived in the U.S. for over 25 years. During that time, he has married twice, built a business, and started a family. He has done various work over the years, but the majority of his work has been in the field of asbestos abatement. He started out working for others, but has had his own company, Environmental Connection, LLC, since 2012. As the presentence report states, his business is in good

standing with the secretary of state, and the income from this business is the sole source of support for Mr. Rivas-Hidalgo's family.

Mr. Rivas-Hidalgo has two children with his wife Vanessa Aliaga, and he is very proud of his children who are thriving. His daughter, 18, is attending college at the University of Colorado in Colorado Springs, and his son, 15, is still in high school. They are good kids, and this process has been difficult for them, especially after what they experienced in 2019 when their father was being interrogated by immigration agents in Miami as explained below. Letters from Mr. Rivas-Hidalgo's family will be provided to the court through probation pursuant to D.C.COLO.LCrR 32.1(e). Mr. Rivas-Hidalgo's conduct does not rise to the level of necessitating his removal from his family, community, and business.

    B.   <u>Nature and Circumstances of the offense.</u>

Mr. Rivas-Hidalgo was fully unaware of the flag in the system connecting him to another identity. He had traveled internationally without issue many times since obtaining his citizenship and passport in 2012, usually on trips to visit his family in El Salvador. When he was confronted in 2015 by agents at Houston International Airport, who accused him of being someone else, he was extremely surprised and shaken. Their entire family, along with other family members, like Ms. Aliaga's brother and parents, were on their way back from Peru where Ms. Aliaga's family originates from. That trip had been their kids' first time to Peru, and the main purpose was to visit Ms. Aliaga's grandmother who is elderly and a very important person in their family. Mr. Rivas-Hidalgo was separated from his family and interrogated at the airport.

5

Mr. Rivas-Hidalgo disputes the agent's version of what he reportedly said while he was being interrogated at the airport in 2015. However, after having his passport taken and being made aware of a possible discrepancy with his identity, Mr. Rivas-Hidalgo sought out legal advice about what to do. He wanted to clear things up because he cherishes his citizenship and was concerned, as anyone would be, of any issue with that. However, he was advised to not take any affirmative action because if there was an issue, he would receive correspondence about it from the authorities. Mr. Rivas-Hidalgo followed this advice and was careful to look for any correspondence from the government. For example, when the family moved to a new home about a year later, they made sure all their mail was properly forwarded and that all addresses were current so that if there was correspondence coming it would reach them. They never heard anything, and to some degree, felt that perhaps what they had been confronted with at the airport in 2015 wasn't anything to be worried about.

In the three years between when Mr. Rivas-Hidalgo's passport was seized in 2015, and when he applied for a new one in 2018, the family did not travel internationally. However, in 2018, Ms. Aliaga's grandmother fell, injured her hip, and was ailing. There was a pressing desire to visit her, to help her, and to spend time with her while she was alive. So, having heard nothing from authorities, Mr. Rivas-Hidalgo decided to apply for a new passport so they could travel to Peru and visit family.

It was foolish and irresponsible for Mr. Rivas-Hidalgo to state on his application that he had lost his passport on an airplane when he hadn't. What he should have done is tell the truth, explain the circumstances, and perhaps that would have triggered a

6

process whereby the erroneous connection between him and the unknown person named "Gilberto Guerra-Mayorga" could have been rectified absent a federal felony criminal prosecution. He was also conflicted about how to reconcile his own desire to clear things up and the legal advice he received to leave the issue alone and wait until he heard something. And to some degree, he hoped (wishfully) there wasn't actually a problem and that he had nothing to worry about. When his passport application was processed quickly and without issue, it seemed to support the notion that there was no longer a problem. But as we now know, there was indeed a flag remaining that was triggered when the family returned from Peru in January of 2019.

On this occasion, authorities separated Mr. Rivas-Hidalgo from his wife and children again, but they were close enough in a nearby room to hear the agents yelling at him. Mr. Rivas-Hidalgo was in custody for many hours, with his distraught family nearby, at times the children crying about what they could hear through the walls. Ms. Aliaga pleaded with the authorities to give her information about what was going on, but they refused. No reports or notes from this interrogation have been provided in this case either. At the end of that ordeal, Mr. Rivas-Hidalgo's passport was again taken, and he was allowed to travel home.

There are obviously a lot of better ways that Mr. Rivas-Hidalgo could have gone about trying to renew his passport and establish the validity of his identity and naturalization. His decision to fib on the form has cost him dearly, and has embroiled him in bewildering and terrifying court process—all of which could likely have been avoided had he chosen to go about things another way. But there is no evidence that

7

Mr. Rivas-Hidalgo used his passport, or applied as he did, for a nefarious purpose, and the government agrees. He just wanted to accompany his family on their trip to Peru. But because of the choice he made, Mr. Rivas-Hidalgo is now a convicted felon, and has been forced to clear his name, and possibly defend his legitimate naturalization, in expensive and stressful court proceedings.

1. *A six-month sentence to prison is out of step with other cases in this district.*

A review of the facts and sentences in recent prosecutions in the District of Colorado where a defendant was convicted of violating 18 U.S.C. §1542 supports the sentence recommended by probation and demonstrates that Mr. Rivas-Hidalgo's conduct is less aggravated than the other defendants who have been similarly convicted. The table below contains the facts and sentences for the six other cases in the District of Colorado going back to 2014 in which the defendant was convicted of violating §1542:

| Case | Facts | Sentence |
| --- | --- | --- |
| *U.S. v. Lopez*<br>14-cr-202-PAB | Defendant Robert Moises Lopez, a U.S. citizen, applied for a passport using the name and information of a completely different person (Dustin Alexander Epstein). Mr. Lopez said he did this because he was having trouble finding work with his criminal background.<br><br>Offense Level: 6[1]<br>Criminal History Category: IV | 5 years probation |
| *U.S. v. Roth*<br>15-cr-79-MSK | Defendant Jerald Roth, a U.S. citizen, applied for a passport in 2014 using the fictious name, driver's | 2 years probation |

---

[1] Neither Mr. Lopez nor Mr. Roth received the 4-point increase for obtaining or using the passport because the discrepancies in their applications were discovered prior to the issuance of the passport during the application review.

8

| | | |
|---|---|---|
| | license, and name change documentation of a person who had died in 1970. Mr. Roth admitted that he did this to get a "fresh start."<br><br>Offense Level: 6<br>Criminal History Category: I | |
| *U.S. v. Almodovar*<br>15-cr-177-REB | Defendant Rogelio Almodovar, likely not a U.S. citizen from a review of the plea agreement, obtained a passport in 2008 using the name, social security number, driver's license, and birth certificate of someone named Javier Alarcon (who was a U.S. citizen). Later, in 2013, the defendant tried to get a Colorado ID card using the Javier Alarcon identity, but the DMV facial recognition software flagged that the defendant had previously obtained a Colorado driver's license in yet another name, M.R.<br><br>Offense Level: 10<br>Criminal History Category: I | 6 months prison<br><br>2 years supervised release |
| *U.S. v. Horner*<br>17-cr-77-PAB<br><br>*Also see*, *United States v. Horner*, 769 Fed.Appx. 528 (2019) | Defendant Ronald Horner was indicted in May of 2016 in Montana for child pornography offenses. He was allowed to reside in Colorado pending trial provided he surrender his passport, not apply for a new one, and submit to location monitoring. Two months after surrendering his passport, Mr. Horner applied for a new one, falsely stating that he had lost his passport when he forgot it was inside a damaged suitcase he discarded. He was issued a new passport, shortly after which he cut off his electronic monitoring device and fled the country to abscond justice. After five months on the lam, Mr. Horner was picked up in Guyana and sent back to the U.S. where he was charged in Colorado with making a false statement on a passport. Mr. Horner was convicted after a jury trial. By the time he was convicted in Colorado, he had been convicted in the Montana case and sentenced to 154 months imprisonment.<br><br>Offense Level: 15<br>Criminal History Category: II | 27 months prison consecutive to Montana case 16-cr-40<br><br>3 years supervised release |

9

| | | |
|---|---|---|
| *U.S. v. House* 18-cr-458-RBJ | Defendant Robert Charles House applied for, and received, a passport in 2006 using the name, date of birth, and social security number of his deceased brother. Mr. House has previously applied for, and received, a social security number in his brother's name, which he later used for his 2006 passport application. Mr. House was charged after he attempted to renew the fraudulently obtained passport in 2017.<br><br>Offense Level: 10<br>Criminal History Category: I | 3 years probation |
| *U.S. v. Austin* 19-cr-472-WJM | Defendant James Michael Austin applied for passports in July of 2017 on behalf of himself, his wife, and his two children. The facts are fairly lengthy and complex, but an investigation into the information submitted by Mr. Austin revealed that he had provided many fraudulent documents, including fake IDs, fake notarized documents, and a completely fake court order purporting to be from the Superior Court of California. Further investigation revealed that Mr. Austin had used many identities over time, including ones he had purchased over the internet. He admitted his purpose in doing all of this was to avoid financial obligations and warrants that he had outstanding in several jurisdictions under several different names.<br><br>Mr. Austin pled guilty to four charges, including passport fraud in violation of 18 U.S.C. §1542. He was sentenced to 16 months on this count concurrent with count 2, possession with intent to use or transfer five or more ID documents or feathers. He was sentenced to a consecutive 24 months as mandated by statute for his convictions on counts 3 and 4 for aggravated identify theft. His total sentence was therefore 40 months.<br><br>There was a dispute about the offense level, but Mr. Austin's criminal history category was VI. | *See facts column* |

10

Of the six other cases, three defendants received prison sentences. Those cases are far more aggravated than this one. Mr. Almodovar was a non-citizen who was living under a completely false identity for many years and there was evidence that he had used additional false names as well. Mr. Horner was a convicted trafficker of child pornography who used his fraudulently obtained passport to try and escape justice outside of the United States. Finally, Mr. Austin was a serial criminal who had used many false identities over time as a method of skirting the law and his responsibilities. Mr. Rivas-Hidalgo's case is completely dissimilar to these defendants.

This case is also less aggravated than the three defendants who received probation sentences. Mr. Lopez applied for a passport with a totally different identity as a way to hide his criminal history. Mr. Roth also applied for a passport using a completely different identity as a way to hide who he was and get a "fresh start." Mr. House used the name of his deceased brother to first obtain a social security number, and then a passport, which he possessed for over a decade. Unlike these defendants, Mr. Rivas-Hidalgo did not apply for a passport in someone else's name and he didn't do it in an attempt to evade justice. There is no dispute in this case that the only conduct at issue here is Mr. Rivas-Hidalgo's false statement related to how he lost his passport.

The House case was handled by the same AUSA as this case. Mr. House was facing the same advisory guidelines range as Mr. Rivas-Hidalgo. In the House case, as part of the plea agreement, the government agreed to recommended 6 months of home detention with a curfew followed by 2 years of probation, which is a more lenient recommendation than the government is making here. The court did not agree with the

11

government and sentenced Mr. House to probation. Standing alone, the facts and circumstances of Mr. Rivas-Hidalgo's case do not warrant a prison sentence, which is further supported by the comparison to others similarly convicted. The government's argument that Mr. Rivas-Hidalgo should go to prison for six months is lacking substantial justification and cannot be squared with the other similar cases in this district. The "heartland" of passport fraud cases appears to actually be when a person applies for a passport in a fully fraudulent identity. Furthermore, all the other six defendants did have a nefarious purpose when fraudulently obtaining their passports and in most instances their guidelines ranges were the same or *less* than in this case.

### IV. Additional §3553 sentencing factors.

The fact that Mr. Rivas-Hidalgo will be a convicted felon, by itself, sufficiently reflects the seriousness of the offense in light of the conduct at issue. 18 U.S.C. §3553(a)(2)(A). Furthermore, this conviction promotes a respect for the law and no further punishment than that recommended by probation would advance that goal. *Id.* This case, standing alone, has had (and will have) substantial deterrent impact on Mr. Rivas-Hidalgo and sends the message to others that passport applications are to be taken very seriously. 18 U.S.C. §3553(a)(2)(B). Prison is recognized, even by the government[2], as providing minimal to no deterrent effect on defendants, and in this case any additional prison time will not increase the deterrent impact on Mr. Rivas-Hidalgo. This is even more true when he may be facing future denaturalization proceedings and he won't have a passport until all of this is properly cleared up (and therefore won't be

---

[2] *See e.g.* the linked bulletin from the Department of Justice: https://www.ojp.gov/pdffiles1/nij/247350.pdf

12

able to visit his or his wife's family abroad). Last, placing Mr. Rivas-Hidalgo in prison is not necessary to protect him from the public because it is undisputed that he poses no danger to the community. 18 U.S.C. §3553(a)(2)(C). His conduct on pretrial release has been exemplary, and the probation department also acknowledges that Mr. Rivas is not a danger to the community and is not a flight risk. *See* Doc. 40-1, p. R-3.

The probation department also recommends a variant sentence based upon factors identified in the presentence report; viz., the nature and circumstances of the offense, the amount of time Mr. Rivas-Hidalgo has been in the U.S. without issue, his limited criminal history, and his compliance while on pretrial release supervision. Doc. 40, p. 13. This assessment is further supported by what is presented herein. The types of guidelines sentences for a person in Zone B, which either require imprisonment or a complicated mix of probation and sentencing alternatives, is not necessary to achieve a sentence which is sufficient, but not greater than necessary, to achieve the aims of sentencing. The government's request for a purely punitive sentence is fully disproportionate to the conduct at issue. A sentence to time served with one year of supervised release, as recommended by probation, is the correct sentence in this case.

Respectfully submitted this 30th day of April, 2021.

/s/ Luke W. McConnell
**Luke W. McConnell, #40414**
Mulligan Breit McConnell, LLC
475 W. 12th Ave, Suite D
Denver, CO 80204
(303) 295-1500
luke@mulliganbreit.com

13

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

/s/Luke W. McConnell

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of April, 2021, a true and correct copy of the foregoing **DEFENDANT'S MOTION FOR A VARIANT SENTENCE** was filed electronically with the Clerk of the Court using the CM/ECF system which will send notification to the following email addresses:

Andrea Lee Surratt
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
*Andrea.surratt@usdoj.gov*

Attorney for Government

/s/ Luke W. McConnell
Luke W. McConnell